Good morning. May it please the court. Philip Talbot for the United States. And I'd like to reserve two minutes for rebuttal. In this case, the district court erred by throwing out the jury's verdict after trial on count four against the defendant based on venue concerns. You haven't appealed the dismissal of three, is that right? That's correct, Your Honor. This is strictly limited to count four. In this case, venue was proper for count four in the Eastern District of California on an aiding and abetting theory of liability, in that the defendant was alleged to have aided and abetted the Sacramento defendants in their possession of pseudoephedrine in the Eastern District of California by providing it to them in the Central District of California. Could I ask you this question? Yes. Because I'm a little troubled by the outer limits of the argument. If the charge had been pure possession in the Central District as opposed to possession with intent distributed to the manufacturer of meth, would the aiding and abetting theory that you're advancing allow that transaction, the seller in Central District, to be tried in the Eastern District under aiding and abetting? If there was a possession with intent to distribute crime charge? With intent to distribute, just mere possession. Well, this is of a chemical that the agent possessed, so maybe we should hypothesize that possession of a controlled substance. In this case, actually, the charge, and this is something that I think confused the district court some, in part because both count three and count four were being considered at the same time. The charge here was possession of pseudoephedrine, knowing or having reason to possibly be. I know, but I'm positing that it was a pure possession. Now, without, if there is such a charge, in other words, if all that he was charged with was possession, that is, that's all Valdo Santos was ultimately charged with, that he wasn't charged with possession with intent or knowledge that it was going to be used. And if it was a straight, for example, a misdemeanor possession of methamphetamine charge. And I think with this you would have to look at the elements of aiding and abetting liability to determine whether he had the specific intent to facilitate the crime by the principle and whether it was truly a continuing crime under the facts of the case. In this case, I would argue that it's clear it's a continuing crime. The Sacramento-based defendants took the pseudoephedrine, drove immediately into the Eastern District of California where they had a lab set up and prepared to go under different facts where there was some sort of interruption in events with respect to possession. I think you could have a different case. And I think in that circumstance, it's really aiding and abetting liability, the required elements, specifically the specific intent to facilitate the principles commission of the crime, is the protection against any kind of extreme extension across various districts. And here you would still have to look at whether there was aiding and abetting liability in the initial district so that someone in the defendant's position, if he truly did not aid and abet the principles commission in the Central District of California, he surely didn't in the Eastern District of California either. So we're not asking for an extension of theories of liability that go beyond any kind of factual or reasonable balance. We're asking for a recognition, as this Court previously did in Mendoza on a pretrial challenge, that traditional aiding and abetting concepts of liability be followed here when you have a continuing crime that occurs both in the Central and Eastern Districts of California. Does it make a difference? I'm sure I know what your answer is. He was not indicted in the Eastern District for aiding and abetting. Instruction was given, but I don't think he was indicted. Specifically, that wasn't part of the indictment. That wasn't part of the indictment, and the case law, I think, makes it clear that that's not required. Is it implied in every federal crime, aiding and abetting? In every indictment, the aiding and abetting, in fact, our office doesn't charge aiding and abetting, to my knowledge, as a separate theory, even when that is our main theory based on the case law out there that holds that it need not be charged. The aiding and abetting theory was fronted in the trial brief as to this count, count four, and there was a specific jury instruction tailored for the jury as to count four. In Mendoza, this court looked at this issue in a pretrial context, a pretrial challenge. The facts hadn't all been developed. In Buchanan, Brantley, Long, and Russo, the 8th and 11th circuits looked at similar circumstances, albeit with a possession with intent to distribute charge, where someone had supplied another, the principal, who then went into another district, and the second district was the place of trial. And in all four of those cases, the other circuits upheld this theory of liability and venue on this theory of liability against a venue challenge. The district court seemed to be concerned that there was something different about this case because the defendant actually possessed the pseudoephedrine prior to transferring it to the Sacramento-based defendants in the Central District of California. But I think under the case law, it's clear that these are not two actual possession and aiding and abetting liability are not mutually exclusive theories of liability. In fact, in the 8th and 11th circuit cases that I just mentioned, it appears from the facts that the supplier at one time possessed in the other district, but not the district of trial, either the drugs or the counterfeit bills in each. In addition, in the D.C. Circuit's decision in Raper, the opposite argument was being made that, in fact, the defendant had to have actually possessed the drugs prior to the transfer in order to be an aider and abetter. And there the court decided, no, in fact, you don't have to actually possess. And so here we have the converse seem to concern the district court that the defendant had actually possessed prior to transfer. It is true that the defendant could have been charged and tried for actual possession in the Central District of California, but these venue theories are not mutually exclusive. And just because venue is correct in one district doesn't make it incorrect in another district. The district court also seemed concerned that the defendant's participation in the crime ended in the Central District of California. In other words, that he didn't do anything in the Eastern District of California itself. I remember Carlton thought it seemed strange that Valdez-Santos would care at all. Right, and I think. Whether it was made or not. Yes, and. He was out of it. Well, he was and he wasn't. Here, the testimony was that Valdez-Santos, in testimony by Fernando Rios-Ramirez, who was his supplier, that Valdez-Santos was a large-scale trafficker and pseudofedron. It wasn't just a one-time street deal for him. He was picking it up from Rios-Ramirez on a weekly or price-weekly basis. So his pricing reflected the market he was dealing in. And actually his pricing was a little bit higher, according to Jorge Ayala, one of the Sacramento defendants. But there was some evidence of the economics of his status in the overall. Oh, yes. Yes, there are amounts that were testified to as far as how much Rios-Ramirez was dealing and how much Mr. Valdez-Santos was picking up and how often. And then the amount of pseudofedron here, I believe, was somewhere in the neighborhood of 300,000 pills for approximately $60,000. At the transaction, Magana and one of the Sacramento defendants and Valdez-Santos recognized each other, that they knew each other, and Valdez-Santos gave his phone number to Magana. So I think the jury could infer that although this was the first dealing, there was a possibility, at least, of future dealings. The Sacramento-based defendants, there was testimony that this wasn't their first trip to Los Angeles and this wasn't the first time that they had considered doing this. And I'd like to reserve the remaining time. Good morning, Your Honors. Fred Dawson on behalf of the appellee defendant in this matter. I must say I'm in a bit of an unusual position defending the ruling in the district court. It must be fun for it. Well, it is. And, frankly, I think in this case the district court was right. And it may be right limited to the particular facts in this case, but I think that the issue that really troubled the district court was under these facts, are there any limitations, spatial, temporal types of limitations on the aiding and abetting concept? Or does it just go on forever? Does it reach backward forever? Are there times when you can say, timeout, you just can't stretch this and get around the constitutional venue issue? And I think that what particularly focused this issue was the application of the Linnick case to the other counts where the court found there was no other evidence beyond the actual transaction, the sale, that caused Valdez-Santos to be a participant beyond that particular point in time, and, for that matter, in Los Angeles as opposed to anything beyond the central district. What significance do you attach to the fact that the count that he was charged on was with intent to further the manufacture of meth? Doesn't that carry with it the notion that this is not a local transaction necessarily, that the buyer is likely, just as likely, well, I don't know if likely or not, but given the meth labs and the like, they aren't generally always in downtown Los Angeles. They may be crossing over into another district. That's certainly a potential factual scenario. The difficulty here, and I think this is one of the problems for the trial court, was that there was no evidence that would suggest Mr. Valdez-Santos was really on notice that something was going to go on beyond the limitations of the Los Angeles or central district area. The government just commented that they knew each other. There was some suggestion in the conversation that they knew each other. And as I recall the testimony, that's true. But they knew each other from Mexico. Where the transaction occurred, where all of the communications occurred involving Valdez-Santos, according to the evidence of the trial court, was in Los Angeles. He was sort of a replacement that came into the picture after Magana and his group couldn't locate a source for this material. Did he know where the buyers were themselves located, where they came from? There was no evidence of that, at least that I recall in the transcript, of the fact that these folks were from Sacramento. If there was any conversation about that at the time the actual transaction took place, it was not repeated at the time of trial. And to my knowledge, there was no communications to that effect. So I think the thing that troubled the district court in which there was some concern about the concept, when does the government have the right to run an end run around the venue requirement of the Sixth Amendment? And in this case, given the particular facts where there was clear evidence that could have supported these charges in the central district, I think the district court's assessment was that there's got to be some way to limit the government's ability to simply pull everyone into this particular district on some theory of aiding and abetting that has no limitation. And I think that's where the district court got into the sort of, if you will, the putting a limitation on the aiding and abetting concept here. The issue becomes, I think, really, how much can the government go back? Does the act of a transaction, in this case the sale of these pseudoephedrine pills, is there a continuing interest in what happens with that material once it's transferred? Well, it is. He did accept, Judge Carpenter did accept the notion that this is a continuing transaction. Yes. Yes. Continuing transaction on the part of the Magana group who, once they acquire it, then they're into things. But he didn't buy that as it applied to Valdez Santos, that his — I know, but just to cabin this, the district court assumed it was a continuing violation because the nature of the crime was to facilitate the manufacture of meth. And in the case before him, he had given the jury the aiding and abetting instruction without objection. So therefore, your client was subject to prosecution as an aider and abetter. So then doesn't it just come down to whether, in the nature of at least this case, is foreseeable and therefore fair, if you will, for the government to prosecute the aider and abetter in the district in which the principle he's aiding and abetting himself is manufactured? When the court uses the word foreseeable, which comes to mind in my thinking is the Pinkerton kind of analysis in conspiracies. And I think that's where it breaks down, is because aiding and abetting, I think, does not necessarily imply that continuing foreseeability. And if you're going to get into that reasonable man analysis of foreseeability, maybe it would apply in this case, maybe it wouldn't. But I think the court looked at the evidence on the Rule 29 motion and said the evidence really doesn't support that kind of analysis on the record that was made in the trial. That's why that Rule 29, I think, was ultimately granted as to the other two counts, leaving only the last count, and ultimately the court decided on that count the evidence all involves conduct in the central district. That's why we're here. But Mendoza tells us that any part of the crime... Did I hear correctly? Any part of the crime? Yes. So part of the crime clearly is in Sacramento or up that way. Certainly on the part of those people who were the purchasers. Not necessarily on the part of the seller. And that's where, do you divest your interest? Do you care what happens once the buyer gives you the money? If there was evidence that there would be a continuing interest of some type in the processing of that pseudoephedrine, I would agree with you. But there wasn't, and that's what distinguishes most of the cases that the government seems to be relying upon on this unending aiding and abetting liability. If you look closely at those cases, there's a couple of them in particular where factually there's a continuing interest in what happens to the material once it changes hands. In this case, it's a one-time sale, divesting of any interest, and I think the court was impressed that the linic analysis has to apply to that as much as it does simply to the sale issue. Well, wasn't there some history of kind of a trade developing between Los Angeles and the Eastern District in developing a customer base and a relationship? Not to my knowledge. I thought that these other characters were bringing Valdez Santos into it. Negative. Negative to my recollection of the facts and the record. He was simply a one, in fact, sort of a substitute, if you will, broker. For the person they had been dealing with. Right. But he was also in L.A., wasn't he? I just wonder how, if there's kind of a, this case has bothered me right from the beginning about what limits there are on the venue of where the final product gets used because a lot of this stuff might come from Jacksonville in the 11th Circuit. Exactly. And you've manufactured in Elk Grove. But where would the venue be? And I think that's exactly what troubled the district court was that there may be no limitation to that long arm of the government reaching backwards along the trail as long as there may be some evidence that says whoever dealt with this material or transported it or had something to do with it was aware it could be ultimately converted into an illegal substance, the precursor type of chemicals. And I think that's exactly why the district court said there's got to be a limit. This is a case where the facts show no continuing interest in that material. Once the transfer occurred, the government take him back, prosecute him in the central district, but not here. That's why I think we're here today. I think I'm about done, so thank you. All right, thank you very much. Your Honors, just briefly, with respect to whether the defendant was aware that the Sacramento defendants were from outside Los Angeles, the testimony was that while he was a replacement supplier, it was brokered that he would be a replacement supplier by someone only known as Ramon Sita from Redwood City who was in phone contact with the Sacramento defendants back and forth, and that's how it was arranged. So whether he believed that the defendants were traveling north to the eastern district or whether he believed they were traveling north through the eastern district to the northern district of California, that plus the fact that Jose Magana brought his family along and had luggage that needed to be taken out of his truck prior to lending the truck to the defendant were all indications to him that these were not people that were going to go down the block and manufacture right there. With respect to the concern... The evidence of his awareness of the out-of-district nature of the buyers? The Redwood City... Those are the facts that I think the jury could infer based on that that there was some at least possibility of out-of-district connection. This was someone who was, like I said, not a street dealer who was meeting someone for the first time and probably the last time. This was someone who dealt in large quantities, who charged, according to Jorge Ayala, a pretty steep price, and who gave his phone number at the end of the transaction. I think there there's an indication of a shared interest by the defendant in the success of what was going on with these customers so that they might come down again. And I see my time is up, unless there's any further questions. We'd ask that the district court's decision as to Count 4 be reversed. Thank you, Your Honor. Counsel, thank you for your arguments. All right, the case argued is submitted.
judges: Goodwin, B. Fletcher, Fisher